# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TINA M. WASIELA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-114 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

## I.    INTRODUCTION

Tina M. Wasiela ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq*. Plaintiff filed her applications on February 16, 2007, alleging disability since January 1, 2000 due to fibromyalgia, chronic fatigue syndrome, diabetes, a back injury and depression (AR 119-123; 153).[1] Her applications were denied (AR 69-78), and following a hearing held on November 5, 2009 (AR 25-66), the administrative law judge ("ALJ") issued his decision denying benefits to Plaintiff on February 3, 2010 (AR 11-19). Her request for review by the Appeals Council was denied (AR 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). Plaintiff filed her complaint in this Court on May 20, 2011 challenging the ALJ's decision. Presently pending before the Court are the parties' cross-motions for summary judgment. For the following reasons, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.

---

[1] References to the administrative record [ECF No. 6], will be designated by the citation "(AR ___)".

1

## II. BACKGROUND

Plaintiff was 47 years old on the date of the ALJ's decision and has a high school education (AR 18). She has past relevant work experience as a telephone assembler, flagger, school cleaner, bakery clerk, hotel cleaner and retail clerk (AR 154). Plaintiff reported that she stopped working full time on June 6, 2006 (AR 154).[2]

*Medical History*

A. *Physical impairments*

1. *Heritage Primary Care*

Plaintiff was treated at Heritage Primary Care from June 2005 to September 9, 2009 (AR 319-323; 444-503; 521-561). Treatment records reveal that Plaintiff was seen for complaints of diabetes, depression, fibromyalgia, fatigue, thoracic back pain, and paresthesias in 2005 (AR 499-503). In 2006, Plaintiff was treated for low back pain and lumbar strain (AR 319-321). In 2007, Plaintiff was treated for strep throat, depression, attention deficit disorder, allergic rhinitis, diabetes, irritable bowel syndrome, periodic limb movement sleep disorder, and osteoarthritis (AR 476-498). Plaintiff was treated for diabetes, depression, back pain, shoulder pain, arthralgias, and sinusitis in 2008 (AR 444-475).

Plaintiff continued to receive treatment throughout 2009 (AR 521-561). On March 26, 2009, she complained of low back pain radiating to her left thigh (AR 547). Her chief complaint on March 26, 2009 was low back pain that began in 2004 after pulling a heavy garbage can (AR 547). On physical examination, Carl Eby, M.D., found tenderness on palpation of Plaintiff's lumbosacral spine and some spasms of the paraspinal muscles (AR 549). She had normal range of motion in her lumbosacral spine, her straight leg raising tests were negative, and her motor strength was normal (AR 549). She was assessed with, *inter alia*, lower back pain and prescribed medication (AR 550). On July 7, 2009, Dr. Eby reported that Plaintiff was doing "fairly well" with her back pain and her musculoskeletal examination was normal (AR 534; 538). On July 31, 2009, Plaintiff complained of body aches, weakness and fatigue (AR 531). She was assessed with arthralgias at multiple sites, fibromyalgia, and fatigue (AR 532). When

---

[2] Plaintiff amended her alleged onset date to June 6, 2006 at the administrative hearing (AR 32).

2

seen by Dr. Eby on September 9, 2009, he found some tenderness on palpation of the Plaintiff's lumbosacral spine with some spasms of the paraspinal muscles (AR 526). Pain was elicited on motion, and her straight leg raise testing was positive on the left (AR 526). Dr. Eby noted that her lumbosacral spine exhibited a normal appearance and she had normal range of motion (AR 526). She was assessed with, *inter alia*, chronic lower back pain, and it was noted she was treating with neurology and pain management (AR 526).

### 2. *Physical therapy*

Plaintiff underwent physical therapy for her complaints of low back pain on three separate occasions (AR 211-251; 265-294; 404-423). Plaintiff's first course of physical therapy occurred from July 11, 2005 to September 30, 2005 at Keystone Rehabilitation Systems (AR 211-251). The discharge summary revealed that she progressed "slowly" in therapy and was able to return to work, but continued to experience pain (AR 211). Plaintiff participated in a second course of physical therapy from January 20, 2006 to March 24, 2006 at HealthSouth Rehabilitation Center of Erie (AR 265-294). On February 22, 2006, Plaintiff reported a forty percent overall improvement in her symptoms, but continued to report deep, burning pain (AR 279). Some L5 mobility was noted on physical examination, but her radicular symptoms had improved, her gait pattern had improved in speed, and her antalgic gait was less frequent (AR 279). Plaintiff attended physical therapy sessions at Waterford Physical Therapy from June 12, 2007 to January 24, 2008 (AR 404-423). The discharge summary revealed that Plaintiff "made very little progress" despite exercises, core stability training and intermittent lumbar traction (AR 423). It was noted that "after extensive physical therapy intervention," Plaintiff expressed an interest in self-managing her symptoms (AR 423). Plaintiff's long term goals were not met and she was "strongly advised" to consult with a neurosurgeon (AR 423).

### 3. *Diagnostic studies*

A lumbar MRI dated March 5, 2005 was negative (AR 264). X-rays taken on July 5, 2005 revealed moderate degenerative disc disease of the thoracic spine, and mild anterior lipping and spurring due to degenerative joint disease of the lumbar spine at the L1 and L2 level (AR 258). An EMG study in February 2006 revealed lumbar radiculopathy (AR 343). Bilateral hip

x-rays dated May 15, 2006 were normal (AR 342). A CT scan of the Plaintiff's lumbar spine dated October 23, 2006 was negative (AR 309-310). A lumbar MRI dated October 31, 2006 showed very mild spondylosis at the L4-L5 level, but was otherwise unremarkable (AR 323).

A lumbar MRI dated October 26, 2007, revealed a right-sided protruding disc at the L2-L3 level with moderate lateral recess stenosis and possible L2-L3 nerve root impingement (AR 393). On March 6, 2008, a CT scan showed a mild bulge at the L4-L5 level, and a lateral bulge at the L2-L3 level, with protrusion into the inferior aspect of the neural foramen with mild indentation upon the thecal sac (AR 395-396). There was also some evidence of abutement of the existing nerve root at the L2 level (AR 395-396). An EMG in June 2008 showed mild chronic left L3 radiculopathy with paraspinal denervation (AR 394).

### 4. *Theresa Wheeling, M.D.*

Plaintiff received treatment from Theresa Wheeling, M.D., a physiatrist, from January 16, 2006 to January 9, 2008 (AR 332-343; 363-368). On January 16, 2006, Plaintiff reported suffering a work related injury in October 2004 to her lower thoracic/upper lumbar area (AR 339). Dr. Wheeling reviewed Plaintiff's diagnostic studies, and found no evidence of disc disease, noting that the integrity of her discs "look[ed] quite nice" (AR 339). There was very minimal bulge and very mild facet arthropathy on cross sections at the L5-S1 level (AR 339). She diagnosed Plaintiff with thoracic pain and lumbosacral pain (AR 340). She opined that Plaintiff had sacroiliac joint dysfunction and piriformis syndrome,[3] and some thoracic myofascial pain, but no discogenic pain (AR 341). She recommended therapy and medication at bedtime (AR 341).

On March 8, 2006, Plaintiff reported that oral steroids had completely eliminated her symptoms (AR 338), and on April 11, 2006, it was noted that lumbar traction and electrical stimulation had been added to her treatment regimen (AR 336). Plaintiff reported that although she had good and bad days, overall her condition had improved (AR 336). On May 15, 2006, Plaintiff's reflexes continued to remain intact and she had no distal weakness (AR 335). On

---

[3] Piriformis syndrome is an uncommon neuromuscular disorder that is caused when the piriformis muscle, a narrow muscle located in the buttocks, compresses the sciatic nerve. *See* http://www.webmd.com/pain-management/guide/piriformis-syndrome-causes-symtoms-treatments.

4

August 1, 2006, Plaintiff reported that she had resigned from her job but was feeling better and her pain was "more tolerable" (AR 337). On November 22, 2006, Dr. Wheeling noted that Plaintiff was managing independently with her TENS unit and independent exercise, and was undergoing injection therapy (AR 333). Plaintiff reported an exacerbation of her back pain that caused her to seek emergency room treatment (AR 303-308; 312-318). On physical examination, Dr. Wheeling found she was markedly positive for sacroiliac joint and piriformis dysfunction (AR 333).

When seen by Dr. Wheeling on February 21, 2007, she reported she had purchased a treadmill and had lost ten pounds (AR 332). On physical examination, Dr. Wheeling found her reflexes and strength were intact, but she noted that Plaintiff had "incredibly limited" range of motion in her right hip with flexion abduction and external rotation (AR 332). She was continued on medication and the TENS unit (AR 332). On June 7, 2007, Plaintiff complained of left leg pain resulting from chiropractic treatment (AR 368). Physical examination revealed tightness in her left sided hamstrings and pain when attempting straight leg raise testing (AR 368). Dr. Wheeling suspected either "new" acute left L5/S1 radiculopathy with resultant tightening in the hamstrings, or a "pure" hamstring injury (AR 368). She was prescribed a course of steroids and physical therapy (AR 368).

On September 5, 2007, Dr. Wheeling reported that Plaintiff had been doing very well with physical therapy, medication and injection therapy (AR 367). Physical examination revealed that Plaintiff's hamstrings were markedly improved, and her hip range of motion had improved (AR 367). Dr. Wheeling added lumbar traction to her regimen, noting it had "helped nicely in the past" (AR 367). On October 25, 2007, Dr. Wheeling noted that Plaintiff presented with acute left L5-S1 radiculopathy, but that a recent epidural injection had resulted in "nice pain relief" (AR 366). On October 31, 2007, Dr. Wheeling noted that Plaintiff's lumbar MRI showed a significant bulging disc at the L2-3 level (AR 365).

On January 9, 2008, Dr. Wheeling recommended that Plaintiff see a pain management specialist prior to any surgical evaluation (AR 364). On physical examination, Dr. Wheeler found no weakness in L-2 or L-3 distribution, her reflexes were intact, and she noted that all of

Plaintiff's symptoms were in the L-5 distribution (AR 364). She recommended Plaintiff undergo an epidural injection and take the previously prescribed Lyrica twice a day (AR 364).

     5. *Jithendrai Rai, M.D.*

Plaintiff was treated by Jithendrai Rai, M.D., a pain management specialist at Erie Spine and Pain Management from July 21, 2006 to September 18, 2009 upon referral by Dr. Wheeling (AR 369-386; 569-573). Dr. Rai administered right sacroiliac joint injections on July 21, 2006, September 13, 2006, and November 13, 2006 (AR 384-386). On June 27, 2007, he administered both right and left sacroiliac joint injections (AR 383). On July 30, 2007, Dr. Rai noted that Plaintiff had "significant" radicular symptoms down her right lower extremity for which injection therapy provided significant relief (AR 382). Plaintiff reported a gradual recurrence of pain, aggravated by standing (AR 382). On physical examination, Dr. Rai noted tenderness to punch palpation of bilateral sciatic notches, a mild restriction in range of motion and flexion of the lumbosacral spine, and straight leg raise testing was nonconclusive bilaterally (AR 382). Dr. Rai found that Plaintiff's radicular symptoms were recurring, but were not "quite as bad" (AR 382). Plaintiff received a lumbar epidural injection on September 20, 2007 (AR 381).

On October 22, 2007, Plaintiff reported increasing numbness in her left thigh and burning discomfort in her feet (AR 380). Physical examination revealed very mild tenderness over the bilateral SI joints, range of motion of the lumbosacral spine was normal, and straight leg raise testing was negative (AR 380). Dr. Rai formed an impression that Plaintiff had meralgia paresthetica[4] affecting her left thigh, resulting from compression of the lateral femoral cutaneous nerve, and he recommended a nerve block (AR 380).

Dr. Rai administered a lumbar epidural on January 22, 2008 (AR 379). On March 21, 2008, Plaintiff reported that the January injection had helped for a couple of weeks, and decompression therapy was providing temporary relief from her symptoms (AR 378). Physical examination revealed diffuse tenderness of the lumbar paravertebral muscles, restricted range of motion, mild tenderness of the lower lumbar facet joints, with negative straight leg raise testing

---

[4] Meralgia paresthetica is a "disorder characterized by tingling, numbness, and burning pain in the outer side of the thigh." *See* http://www.ninds.nih.gov/disorders/meralgia_paresthetica_/meralgia_paresthetica.htm.

(AR 378). In addition to injection therapy, Dr. Rai recommended a spinal cord stimulator to help combat Plaintiff's radiating pain (AR 378). Plaintiff also received a lumbar epidural injection on March 27, 2008 (AR 377).

When seen on April 25, 2008, Plaintiff reported that the previous injection provided the longest lasting relief (AR 376). Dr. Rai noted that her MRI revealed evidence of a mild disc bulge at the L4-L5 level which appeared to be approaching the nerve root, but not causing significant impingement (AR 376). On physical examination, Plaintiff had diffuse tenderness of the lumbar paravertebral muscles, restricted range of motion, tenderness over the lower lumbar facet joints (AR 376). He recommended repeating the lumbar injection to combat Plaintiff's radiating back pain (AR 376).

Plaintiff continued to receive lumbar epidural injections in June, July, August, September, October and November 2008 (AR 369-375). At her September 8, 2008 visit, Plaintiff complained of low back pain with radicular symptoms in her lower extremities (AR 372). She reported that walking, standing and sitting all aggravated her pain, and although injection therapy provided some pain relief, it was getting progressively worse (AR 372). On physical examination, Dr. Rai found tenderness at the paravertebral muscles, and her muscle strength was 5/5 (AR 372). She was diagnosed with lumbar spondylosis and lumbar radiculopathy (AR 372). On October 17, 2008, Plaintiff continued to complain of pain aggravated by prolonged walking and standing (AR 370). Plaintiff reported that her pain was relieved by lying down and sitting down, and that Lyrica and Cymbalta helped (AR 370). On physical examination, Dr. Rai found tenderness of the paravertebral muscles, the right sciatic notch and the lumbar facets (AR 370). Plaintiff exhibited a decreased lumbar range of motion (AR 370). Her muscle strength was 5/5 and she exhibited a normal gait (AR 370). Her diagnosis remained the same and Celebrex was added to her medication regimen (AR 370).

On February 9, 2009, Plaintiff continued to complain of back pain aggravated by prolonged walking and standing (AR 573). Plaintiff reported relief by lying down, and indicated that Lyrica and Cymbalta helped with the burning pain, as did injection therapy (AR 573). On physical examination, Dr. Rai found tenderness of the lumbar paravertebral muscles, decreased

lumbar range of motion, and mild lumbar facet tenderness (AR 573). Her straight leg raise testing was negative, muscle strength was 5/5, and her gait was normal (AR 573). Plaintiff received a lumbar epidural injection on March 17, 2009 (AR 572). On April 16, 2009, Plaintiff reported some relief from her last injection but that her pain was recurring (AR 571). Her physical examination remained unchanged from her February visit, and Dr. Rai prescribed Lortab and Lyrica (AR 571). Thereafter, Plaintiff received epidural injections June 4, 2009 and September 18, 2009 (AR 569-570).

On November 19, 2009, Dr. Rai completed a document entitled "Medical Statement Regarding Pain" (AR 575). Dr. Rai indicated that Plaintiff suffered from chronic pain that resulted in the need for her to lie down at unpredictable times for two or more hours per day (AR 575).

*6. Donald Rezek, M.D.*

Plaintiff was treated by Donald Rezek, M.D., a neurologist, from May 22, 2008 to September 18, 2009 for her complaints of chronic numbness and tingling in her legs (AR 387-392; 520). On physical examination, Plaintiff's motor examination demonstrated normal muscle strength, tone and bulk in all extremities (AR 392). Plaintiff's reflexes were normal and her gait was antalgic (AR 392). Dr. Rezek reviewed Plaintiff's MRI's, and noted there was no clear cut disc protrusion (AR 392). He formed an impression of chronic radiculopathy/radiculitis, and degenerative disc disease of the lumbar spine (AR 392). He prescribed Cymbalta (AR 392).

On July 16, 2008, Dr. Rezek noted that Plaintiff had significant benefit from Lyrica and Cymbalta, although she was unable to tolerate higher dosages (AR 389). Plaintiff reported problems with her legs shaking during the day, and it was noted she was on Mirapex for periodic limb movements during sleep (AR 389). She was diagnosed with chronic radiculopathy/radiculitis, degenerative disc disease of the lumbar spine, periodic limb movements of sleep, as well as probable restless leg syndrome, and probable peripheral polyneuropathy secondary to diabetes (AR 389). Dr. Rezek increased the Mirapex dosage (AR 389).

On September 16, 2008, Dr. Rezek noted that Plaintiff's gait was "quite limited" and "tend[ed] to be antalgic because of her left leg" (AR 388). No other abnormalities were noted, and her medications were continued (AR 388). On December 16, 2008, Plaintiff complained of increased discomfort in her feet consistent with plantar fasciitis, and Dr. Rezek noted she had been "injected with some benefit by her physician" (AR 387). Plaintiff also noted some increased burning in her left hip (AR 387). Physical examination revealed normal coordination testing and her gait was within normal limits (AR 387).

On September 8, 2009, Plaintiff reported a tendency to invert her right foot, and noted some tenderness in her left leg (AR 520). Her systemic review was otherwise unremarkable, and Dr. Rezek noted that her coordination testing was normal (AR 520). Dr. Rezek further noted that Plaintiff's neck had a decreased range of motion and that she had increased movement of her lower back (AR 520). Water physical therapy was recommended and her medications were continued (AR 520).

### 7. *Other treatment*

Plaintiff was treated for carpal tunnel syndrome by Patrick Williams, D.O. beginning on October 17, 2005 (AR 427-428). An EMG showed mild carpal tunnel syndrome, and Dr. Williams administered injection therapy (AR 427-428). Four years later, Plaintiff was seen by John Lubahn, M.D. on April 7, 2009 complaining of tingling and numbness in her left hand (AR 562-568). It was noted that Plaintiff's right hand had received a carpel tunnel release several years earlier and Plaintiff had done relatively well (AR 567). On May 18, 2009, Dr. Luban performed a left carpal tunnel release (AR 566). On September 15, 2009, Dr. Lubahn noted "slow progress" following the release (AR 563).

### 8. *State agency reviewing physician*

On May 14, 2007, Reynaldo, M. Torio, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could perform light work (AR 344-349). In rendering this assessment, Dr. Torio noted that Plaintiff had chronic back pain since October 2004 treated with physical therapy, medications, and a TENS unit, and that she was to undergo injection therapy (AR 349). He further noted that an October 31, 2006 lumbar

9

MRI showed very mild spondylosis of the lumbar spine at the L4-L5 level, and was otherwise unremarkable (AR 349). He observed that her physical examination on February 21, 2007 revealed intact reflexes and strength, with some limited range of motion of the right hip with flexion, abduction and external rotation, but that she admitted she was not performing her stretching exercises (AR 349).

Dr. Torio recognized Plaintiff claimed limitations with respect to standing, walking, lifting, carrying, bending, sitting, kneeling, concentrating, and remembering due to pain and fatigue (AR 349). He noted, however, that she was able to participate in daily activities, relate fairly well with others, and had pursued appropriate care for her pain (AR 349). He found her treatment to have been "essentially routine and conservative in nature" (AR 349). Finally, Dr. Torio found that the medical record revealed her medications had been "relatively effective" in controlling her symptoms (AR 349).

### B. Mental impairments

Plaintiff was seen by Douglas M. Buyer, Ph.D., on February 28, 2005 (AR 402-403). Dr. Buyer noted that he met Plaintiff "some years ago" and at that time she was typically disorganized, flustered and emotionally reactive (AR 402). He indicated that Plaintiff seemed worse, noting that she was overtly depressed, easily cried, and demonstrated a fragile, unstable affect (AR 402). Plaintiff spoke "largely in tangents" and obtaining information was difficult (AR 402). Dr. Buyer was unable to give a diagnostic assessment, but provided her with a list of psychiatrists and psychotherpists, since his practice was restricted to treating children (AR 403).

Treatment notes from Fuat Ulus, M.D. from March 21, 2005 to October 6, 2005 reveal that Plaintiff was diagnosed with a mood disorder and attention deficit hyperactivity disorder, adult version (AR 252-256). Her global assessment of functioning ("GAF") score ranged from 60 to 70 (AR 252-256).[5] By her October 12, 2005 visit, Plaintiff reported doing "quite well" mentally and emotionally and was satisfied with the counseling she received (AR 252).

---

[5]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR)

10

On December 30, 2009, Plaintiff underwent a psychological evaluation, conducted by Byron E. Hillin, Ph.D. on behalf of the Pennsylvania Bureau of Disability Determination (AR 576-584). Dr. Hillin reported that Plaintiff was cooperative with the evaluation, provided information spontaneously, and appeared truthful (AR 576). Plaintiff stated that she had low energy and multiple medical problems, including diabetes, chronic fatigue syndrome, chronic neck and back pain, breathing difficulties, carpal tunnel syndrome, and depression (AR 576). Plaintiff reported that she stopped working, in part, due to a work injury (AR 578). She also reported that she lived with her daughter, was able to drive, enjoyed knitting, was active in her church (AR 579-580). She described her activities of daily living as limited due to low energy, and she indicated that she relied more on her daughter for cooking and heavy cleaning (AR 579).

On mental status examination, Dr. Hillin reported that Plaintiff was appropriately dressed with good hygiene and exhibited good eye contact (AR 579). Plaintiff was able to walk with an appropriate gait, no motor restlessness or motor fidgeting was present, and she was able to stand and sit without difficulty (AR 579). Dr. Hillin noted that Plaintiff's primary complaints were of a "medical nature" (AR 580). Plaintiff described her mood as depressed, sad and anxious, and she had occasional difficulty focusing, but denied suicidal thoughts (AR 580). Dr. Hillin found her insight was appropriate, and her thoughts were relevant, coherent and goal directed (AR 580). He found she had average intelligence, and that her attention and concentration were good (AR 580). Her social judgment remained intact (AR 581). Dr. Hillin diagnosed Plaintiff with mood disorder, not otherwise specified, mild, and assigned her a GAF score of 65 (AR 190). He found that she was in need of continued medical treatment, including treatment for mild depression, and her prognosis remained fair (AR 581). Dr. Hillin concluded that Plaintiff's ability to understand, remember, and carry out instructions were not affected by her mental impairments (AR 583). He also concluded that she was only moderately limited in her ability to interact appropriately with the public, supervisors and co-workers (AR 583). He found her

---

34 (4th ed. 2000). An individual with a GAF score of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, … but generally functioning pretty well" and "has some meaningful interpersonal relationships." *Id*. An individual with a GAF score of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning … ." *Id*.

11

markedly limited however, in her ability to respond appropriately to work pressures in a usual work setting and changes in a routine work setting (AR 583).

On May 22, 2007, Ray M. Milke, Ph.D., a state agency reviewing psychologist, reviewed the psychiatric evidence of record and determined that Plaintiff did not have any serious mental health impairment (AR 350-362). Dr. Milke noted that Plaintiff had a diagnosis of a mood disorder and ADHD, but had only mild limitations in all areas of functioning (AR 360).

*Administrative hearing*

Plaintiff and Joseph Kuhar, a vocational expert, testified at the hearing held by the ALJ on November 5, 2009 (AR 25-66). Plaintiff testified that she lived with her adult daughter (AR 34). Plaintiff claimed an inability to work due to mental health issues, but acknowledged that she had discontinued professional mental health counseling (AR 36- 41). Plaintiff testified that asthma and allergies also prevented her from working, but her symptoms had not required emergency room treatment (AR 41-43). Plaintiff indicated that she had carpal tunnel surgery on both wrists, and continued to suffer from decreased fine motor skills and grip strength (AR 45). Plaintiff further testified that she had irritable bowel syndrome for which she was prescribed medication (AR 46)

Plaintiff testified that she injured her back in 2004 and stopped working in June 2006 (AR 44; 52). She claimed that prior to quitting her job, she frequently had to rest and lie down during the day (AR 52). Physical therapy was ineffective in relieving her symptoms (AR 44-45). She stated that she used a TENS unit for twenty minutes six to eight times per day, but it too was ineffectual in relieving her symptoms (AR 48-49). She saw Dr. Rai for injection therapy which provided temporary relief (AR 52-53). Plaintiff testified that she would lay down during the day for approximately three to four hours to combat the pain, and also took narcotic medication (AR 50; 54; 57-58). Plaintiff was able to drive short distances, attend church and prayer meetings, walk six-tenths of a mile, stand for twenty minutes before needing to sit, sit for fifteen to twenty minutes before needing to change positions, and lift eight pounds (AR 46-50). Plaintiff claimed she was unable to pick up an item off the floor, and on "bad" days she needed assistance dressing (AR 49). She performed minimal household chores (AR 49).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform light work that did not expose her to pulmonary irritants such as dust, smoke, or fumes, and needed to be in reasonable proximity of restroom facilities (AR 61-62). Such individual would not be able to operate foot controls; crawl, kneel, climb or balance at heights; could perform no more than occasional fine manipulation with her hands; could perform no constant gross manipulation with her hands; and was limited to simple, routine, repetitive work (AR 61-62). The vocational expert testified that such an individual could perform the light positions of a hostess, counter clerk, or office helper, and the sedentary positions of a surveillance system monitor, routing clerk, and desk/information clerk (AR 62-63).

Following the hearing, the ALJ issued a written decision finding that the Plaintiff was not entitled to a period of disability, DIB or SSI within the meaning of the Act (AR 11-19). Her request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 1-6). She subsequently filed this action.

### III.     STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this

court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

## IV. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through September 30, 2011 (AR 11). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. 20 C.F.R. §§ 404.1520; 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is

incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

The ALJ concluded that Plaintiff's back disorder, diabetes mellitus, carpal tunnel syndrome, asthma and mood disorder were severe impairments, but determined at step three that she did not meet a listing (AR 13-15). The ALJ described the Plaintiff's residual functional capacity as follows:

> …[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)[6] except that in addition, the claimant cannot work out *sic* pulmonary irritants such as dust, smoke, and fumes; she must work with reasonable proximity to restroom facilities; she cannot operate the controls; she can perform no crawling, kneeling, climbing, or balancing on heights; she can perform no more than occasional fine manipulation with their *sic* hands; she can perform no constant gross manipulation with the hands; and finally, she is limited to simple, repetitive, routine work.

(AR 15) (footnote added). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 19). The ALJ also determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of

---

[6] This definition states:

> … Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

her symptoms were not entirely credible (AR 15-16). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff contends that the ALJ's rejection of Dr. Rai's opinion that she would need to lie down at unpredictable times during the day was based upon a selective and inadequate review of the medical record. [ECF No. 9] pp. 15-20. In evaluating a claim for benefits, the ALJ must consider all the evidence in the case. *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999). The Third Circuit has also directed that "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence," *Dobrowolsky v. Califano*, 606 F.2 403, 407 (3d Cir. 1979), and "adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000). Without this type of explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705-07 (3d Cir. 1981); *see also Plummer*, 186 F.3d at 429 (ALJ must give some reason for discounting the evidence he rejects).

In concluding that Dr. Rai's opinion was entitled to little weight, the ALJ found, *inter alia*, that it was "poorly" supported by the "objective" medical evidence of record since the Plaintiff maintained normal strength, sensation, reflexes and gait, and her diagnostic studies failed to demonstrate a herniated disc (AR 17). The ALJ stated the following with respect to the medical evidence:

> … In terms of her musculoskeletal complaints, MRI and CT scan of the lumbar spine were initially within normal limits (Exhibit 5F/5; Exhibit 8F/9), and ultimately showed only "very mild" spondylosis (Exhibit 10F/5) and disc protrusion without herniated disc (Exhibit 18F). EMG of the lower extremity was generally unremarkable, and imaging of the bilateral hips [was] within normal limits (Exhibits 12F, 19F, and 20F). Treatment notes indicate some elements of noncompliance (Exhibit 15F). She has tried epidural injections (Exhibit 35F), physical therapy (Exhibit 23F), and chiropractic care, but her physical examination findings are relatively benign. She has some tenderness and limited range of motion, but straight leg raising test is negative and her physician notes generally good reflexes (Exhibits 15F and 16F). Gait, coordination, and cranial nerve examination was normal (Exhibit 17F; Exhibit 32F), as was recent sensation, strength, and reflex testing by her primary care physician (Exhibit 33F/6). …

16

(AR 16).

       The ALJ characterized the Plaintiff's EMG as "generally unremarkable," but failed to note that the report demonstrated mild chronic left L3 radiculopathy with paraspinal denervation (AR 394). The ALJ further found that Plaintiff's MRI and CT scan revealed disc protrusion but no herniation (AR 16). However, the remaining findings from that diagnostic study revealed moderate lateral recess stenosis and possible L2-L3 nerve root impingement (AR 393). The ALJ also failed to address Plaintiff's thoracic x-ray which showed degenerative joint disease of the lumber spine at the L1 and L2 level (AR 258). There was also no discussion by the ALJ of the CT scan in March 2008, which the radiologist read as follows: "[r]ight paracentral to lateral bulge including into the inferior aspect of the neural foramen. This is causing just mild indentation upon the thecal sac though it was likely causing at least some degree of abutment of the exiting nerve root sleeves. Suggest correlation with symptomatology. No other areas of significant stenosis identified." (AR 396). Treatment note entries from Dr. Rai contain additional findings arguably germane to the evaluation of his opinion which the ALJ did not address. On July 30, 2007, Dr. Rai found that Plaintiff presented with "significant" radicular symptoms (AR 382). Dr. Rai also repeatedly found tenderness, back spasms and limited range of motion (AR 370; 372; 376; 378; 380; 382; 571; 573). Also missing from the ALJ's discussion are clinical findings of Dr. Eby based upon his physical examination of the Plaintiff's lumbar spine. Dr. Eby found Plaintiff's lumbosacral spine was tender, that she experienced muscle spasms and pain on motion, and that her straight leg raise testing was positive on the left (AR 526).

       In sum, the ALJ failed to fully consider all pertinent diagnostic studies and findings as discussed above. On remand, the ALJ is directed to address this evidence consistent with *Cotter*.

       Plaintiff further challenges the ALJ's decision to accord "considerable weight" to the opinion of Dr. Torio, the non-examining state agency reviewing physician. Dr. Torio concluded that Plaintiff could perform light work (AR 344-349), and the ALJ found this opinion was "supported by the evidence" and was "consistent with the record as a whole" (AR 17). In light of our finding that the ALJ failed to consider all the pertinent medical evidence, it follows that

his reliance on Dr. Torio's opinion cannot stand. Moreover, the Commissioner's regulations provide:

> [B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in your claim, including opinions of treating and other examining sources.

20 C.F.R. §§ 1527(d)(3); 416.927(d)(3); *see also SSR* 96-6p, 1996 WL 374180 at *3. Since Dr. Torio's assessment was rendered in May 2007, he did not have the benefit of the previously described diagnostic studies, nor the bulk of Dr. Rai's treatment notes. On remand, the ALJ is directed to consider "the degree to which [Dr. Torio] consider[ed] all the pertinent evidence in [the] claim" pursuant to the regulations. 20 C.F.R. §§ 1527(d)(3); 416.927(d)(3).

Plaintiff also argues that a remand is independently warranted based upon her contention that the ALJ failed to give adequate consideration to the St. Vincent Outpatient records diagnosing her with a mood disorder, depression and ADDHD. [ECF No. 9] p. 22. However, the ALJ clearly accepted these findings since he found that Plaintiff's mood disorder was a severe impairment (AR 13). Moreover, the ALJ considered and cited to these treatment records (AR 16).

We also find no merit to Plaintiff's contention that the ALJ improperly rejected Dr. Hillin's opinion that she would be markedly limited in her ability to respond appropriately to work pressures and changes in the usual work setting. Dr. Hillin was a consulting psychologist who examined the Plaintiff pursuant to the request of the Commissioner. The ALJ noted that Dr. Hillin's opinion was inconsistent with his findings on mental status examination, which were generally within normal limits (AR 17). She did not suffer from any suicidal thoughts, delusions or hallucinations, and her thought content was relevant, coherent and goal directed (AR 17; 580). Dr. Hillin found that Plaintiff displayed average intelligence, and her attention and concentration were good (AR 17; 580). Moreover, the ALJ further pointed out that Dr. Hillin's opinion was not consistent with his diagnosis of a mild mood disorder and GAF score of 65 (AR 18). A GAF score of 65 indicates that an individual may have only "mild" symptoms or some difficulty in

18

social or occupational functioning, but is "generally functioning pretty well." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

      Plaintiff's final argument is that the ALJ erred in assessing her credibility. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 29 C.F.R. §§ 404.1529(a), 416.929(a); *Hartranft v. Apfel,* 181 F.3d 358, 362 (3d Cir. 1999). In assessing subjective complaints, *SSR* 96-7p and the regulations provide that the ALJ should consider the objective medical evidence as well as other factors such as the claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. 20 C.F.R. §§ 404.1529(c), 416.929(c); *SSR* 96-7p, 1996 WL 374186 at *2. As the finder of fact, the ALJ can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). In light of the Court's finding that the ALJ's review of the medical record was inadequate, appropriate consideration could not have been given to the Plaintiff's subjective complaints.

## V.    CONCLUSION

      For the reasons discussed above, both Motions will be denied and the matter will be remanded to the Commissioner for further proceedings.[7] An appropriate Order follows.

---

[7] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3d Cir. 2010).

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TINA M. WASIELA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-114 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

AND NOW, this 11th day of June, 2012, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 11] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

                                                               s/ Sean J. McLaughlin
                                                                United States District Judge

cm:    All parties of record